OPINION OF THE COURT
Fuchsberg, J.
The plaintiffs, District Court Judges of the Suffolk District Court, seek among other things, a judgment declaring the perpetuation of an unfavorable salary disparity be *461 tween the plaintiffs and the Judges of the only other District Court in the State, that of adjoining Nassau County, violative of the equal protection provisions of our Federal and State Constitutions.[1] As a supplementary item of relief plaintiffs also sought a judgment covering the resulting unconstitutional salary differential commencing with April 1, 1977, the date the Judges became employees of the State’s unified court system.[2] Named as defendant were the State, its Comptroller, the Chief Administrator of the Courts (both in this capacity and as the representative of the Administrative Board of the Judicial Conference) and the County of Suffolk.
The parties having stipulated that the facts were not in dispute, on a motion for summary judgment Supreme Court, Westchester County, sitting at Special Term, found merit in the constitutional claim and, in a judgment dated July 29, 1980, though it dismissed the complaint against the county, declared that the plaintiffs’ right to equal protection will have been violated unless the other defendants (hereinafter “the State”) took “all appropriate steps to end the salary disparity” prior to October 1, 1980. On cross appeals to the Appellate Division, Second Department, the State directed its attention to the declaration on constitutionality of the salary differential, while the plaintiffs addressed only the correctness of so much of the judgment as allowed the disparity to continue until October 1, 1980. The Appellate Division, applying the rational basis test, as had the Supreme Court, and agreeing that the case presented a potential constitutional violation, modified the judgment by substituting April 1, 1982 for October 1, 1980 as the target date for elimination of the disparity and otherwise affirmed.
On cross appeals to this court, the State challenges the now modified declaration on constitutionality, while the plaintiff Judges confine themselves to “the issue of the *462 appropriate starting date on which plaintiffs were entitled to receive parity with the Judges of the District Court of Nassau County”. For the reasons which follow, we find that the wage disparity represents an unconstitutional impairment of the plaintiffs’ right to equal protection of the laws and that, by way of ancillary relief, the plaintiffs are entitled to judgment for the differentials which were their due since October 1, 1978.
A pivotal point in the events which led to this litigation was the enactment of the unified court budget act, which, to implement the State’s takeover of the courts, provided that judicial personnel were henceforth State employees and that, concordantly, they would be placed on the State payroll on April 1, 1977 (Judiciary Law, § 39, subd 6 [L 1976, ch 966, § 2]).
This abolished the prior system, in which, in many instances, the salaries of Judges, including those in both the Suffolk and Nassau District Courts (L 1962, chs 35, 811), were determined and financed in part by localities. The implications of the change so effected were not left to imagination. As the preamble to the statute put it, “It is both uneconomical and inefficient to have the responsibility of funding this state-operated court system divided among various units of local government. This divided funding blurs responsibility and accountability for an effective court system an d makes the operation of each of the state courts dependent upon varying fiscal capabilities of individual local governments * * * Funding by a single fiscal authority will enable the allocation of moneys and manpower when needed unimpeded by artificial local boundaries and the diverse competing needs of local governmental agencies” (L 1976, ch 966, § 1 [emphasis added]).
Nonetheless, the act suffered existing disparities by a temporally open-ended, provision that “salaries [of District Court Judges] * * * shall continue in effect until altered by state law” (Judiciary Law, § 39, subd 6, par [a] [L 1976, ch 966, § 2]).[3] Thus, no attempt was then made actually to *463 eliminate discrepant financial treatment attributable solely to local government discretion and funding, precisely the kind of nonuniformity it was the avowed purpose of the act to remove.
Over two years later, when, by passing section 221-f of the Judiciary Law (L 1979, ch 55), the Legislature finally did get around to establishing its own salary scales for its newly absorbed District Court Judges, it still chose to maintain rather than to eliminate the disparity.[4] This though on December 1, 1979, years after the State takeover, Judge Herbert Evans, Chief Administrator of the Courts, under legislative mandate that he “investigate whether unreasonable disparity exists in the compensation of judges of courts of the same rank in different parts of the state” (L 1979, ch 55, § 4), reported to the Legislature, to the Governor and to the Chief Judge that continuation of disparity in the courts was “neither necessary, desirable nor equitable” and, with specific regard to the District Courts in Nassau and Suffolk, recommended that their salaries be equalized. Now at the six-year stage, this advice is yet to be heeded.
This long tolerance of the discrepancy cannot be ascribed to any doubt about the accuracy of Judge Evans’ appraisal. For the facts plaintiffs proffered at nisi prius and the defendants did not there contest — and which neither court below found any reason in law to question — included expert appraisals that the two counties, which for many years have formed the State’s Tenth Judicial District, constitute a “true unity of * * * judicial interest * * * indistinguishable by separate geographic considerations”; that the jurisdiction, practice and procedures of each of the District Courts and the functions, duties and responsibilities of their Judges are identical (see Uniform District Court Act); and, that, for practical purposes, as Judicial Conference data certify, their caseloads are substantially the same.
*464 Indeed, lacking adequate explanation for the long delay in eliminating the disparity, the State, as in the lower courts, is now reduced to reiteration of its position that the territorial distinction, coupled with the history of the inequality practiced by the respective counties in years gone by, interdicts an equal protection claim.
It seems to us that the historical differential, in this case at least, cannot serve as a foundation for such an argument. The history to which it alludes almost inevitably was occasioned by the discordant results which were bound to flow from the discredited funding practice which permitted each county to go its own way. But, however intrenched the local influence at one time may have been, it had begun to lose its raison d'etre at least as early as 1962, when the State Constitution first prescribed a unified State-wide court system (NY Const, art VI, § 1, subd a). Its demise obviously had become more imminent by 1972, when a legislative commission reported that “differential treatment within a given court level may be an obstacle to such unification” (Report on Compensation of New York State Legislators and Judges, April 30, 1972, State Commission on Legislative and Judicial Salaries, p 30) and, needless to say, when, in the year before its April 1, 1977 effective date, the preamble to the unified court budget act spoke to the importance of the unified system’s fiscal authority being “unimpeded by artificial local boundaries”, the State must be deemed to have dealt the coup de grace to any remaining vestiges of the policy defendants’ brief would now resurrect. In fine, if anything, unless ancient rather than recent history is resorted to, a study of the past proclaims the proposition that the State has for a considerable number of years come to view differential treatment within a given court level as an irrational rather than a rational way to further the public interest.
Little more can be said for the other prop on which the State posits its equal protection analysis, i.e., that, even absent rational bases, geographical distinctions must survive an equal protection attack so long as they “are not based on constitutionally prescribed categories, such as race”. Authoritatively stated, however, the rule is that, while equal protection does not necessarily require territo *465 rial uniformity (see Salsburg v Maryland, 346 US 545 [preMapp v Ohio (367 US 643) case, permitting State to use illegally obtained evidence in one highly urbanized part of Maryland where there was an unusually high incidence of gambling]; Matter of Rosenthal v Hartnett, 36 NY2d 269, 272-273 [“volume of traffic” and criminal court congestion in the larger cities of this State justify an “administrative rather than a judicial standard of proof” in the adjudication of traffic infractions in cities with populations of a million or more]), “[a] territorial distinction which has no rational basis will not support a state statute” (Manes v Goldin, 400 F Supp 23, 29 [three-Judge court], affd 423 US 1068 [charging of court fees]; Commissioner of Public Welfare of City of N. Y. [Martinez] v Torres, 263 App Div 19 [corroboration required for paternity proceedings in New York City, but not elsewhere]).
Under this rule, analysis of Matter of Hogan v Rosenberg (24 NY2d 207, revd sub nom. Baldwin v New York, 399 US 66), on which the defense places heavy reliance, undermines rather than supports its contrary position. For in Hogan, our court upheld the constitutionality of a law which limited jury trial in New York City to crimes punishable by more than one year in prison. In doing so, it took the pains to point out that “the overburdening caseload existing in the criminal courts of the highly populated City of New York has given rise to extraordinary and unique circumstances which manifests the reasonable basis for making such a distinction” {supra, at p 218).
What this all adds up to is that, “ ‘[w]hile distinctions based on geographical areas are not, in and of themselves, violative of the Fourteenth Amendment * * * a state must demonstrate * * * that the classification is neither capricious nor arbitrary but rests upon some reasonable consideration of difference or policy’ ” (Levy v Parker, 346 F Supp 897, 902 [three-Judge court], affd 411 US 978). Stated differently, to meet the test of rationality, which all courts and parties here have agreed is appropriate to this case, it must appear that there is “some ground of difference having a fair and substantial relation to the object of the legislation” (Manes v Goldin, 400 F Supp 23, 29, affd 423 US 1068, supra).
*466 To measure the present case by these principles, we now turn to Matter of Abrams v Bronstein (33 NY2d 488, 492), an equal protection case arising out of a compensation dispute, where the following test was suggested: after ascertaining “the basis of the classification involved and the governmental objective purportedly advanced * * * [t]he classification must then be compared to the objective to determine whether the classification rests ‘upon some ground of difference having a fair and substantial relation’ to the object for which it is proposed (Reed v. Reed, 404 U. S. 71, 76 ***).”
So viewed, there is no rational basis for the geographic classification on which the State leans to support its defense of the disparate judicial salaries. That the two separate counties compensated their District Court Judges differently (not then subject to equal protection analysis), whatever the asserted justification for that difference, is immaterial to consideration of the claim that there is no warrant for differentiation by the now single employer, the State of New York.[5] Far from advancing a legitimate State objective, a different approach would directly contravene the long-heralded and legislatively indorsed substitution of State for local control of the courts. On the undisputed record, since the disparate treatment of the District Courts of Nassau and Suffolk Counties has now long been without rational foundation, there is no choice but to declare it offensive to the plaintiffs’ constitutionally protected right to equal protection of the laws of this State.
Finally, having so decided, we turn to the matter of the date as of which it is appropriate that the obligation to pay the Suffolk County District Judges the differential between the salaries they have been receiving and those paid to their counterparts in Nassau County should be computed. The submission filed on behalf of the plaintiffs, realistically recognizing that a “brief and temporary disparity in salaries incidental to the unification of the *467 courts” would not be unprecedented (Alesi v Procaccino, 47 AD2d 887 [nine-month delay]), suggested an outside date would be October 1, 1978.
In our own consideration, we start with fixed landmarks. One is the fact that approximately six years have now elapsed since the adoption of the uniform court budget act (L 1976, ch 966) and that over half a decade has gone by since April 1, 1977, the date on which, in accordance with the act, the State assumed responsibility for the plaintiffs’ salaries. A second is that a related obligation to classify and so eliminate disparities among the unified court system’s nonjudicial employees was honored without event as of April 1, 1978 (L 1979, chs 309, 311).
But puzzling is the legislative failure to have acted on this subject when, in 1979, it finally focused on the salaries of the District Court Judges. It appears to us that, since the Legislature then found the time to fix salaries, even retroactively to October 1, 1978, it surely was presented with the occasion to see to it that, in the process, the parity required by the Constitution was achieved. Had it so acted, the unconstitutional differential between the Nassau and Suffolk Judges would have been rectified as of the retroactive date set by the Legislature for the action it did take.
This leads quite logically to the conclusion that fixing October 1, 1978 as the date from which to measure the accrual of plaintiffs’ rights would accord with simple equity and fairness. This is particularly so since deferral to a later date would not merely lessen the relief for many plaintiffs, but, in whole or in part, would vitiate it for those who retired on or after the designated date, with corresponding exclusion of parity from their pension bases (see Judiciary Law, § 39, subd 9, par [a]; Retirement & Social Security Law, § 2, subds 2, 9; § 75, subd a, pars 3, 4). A later date would also be an unreasonable and undeserving departure from the long-recognized rule that a remedy should be coextensive with the wrong it is to redress (Wicker v Hoppock, 6 Wall [73 US] 94, 99, quoted with approval in Albemarle Paper Co. v Moody, 422 US 405, 418-419).
In sum, the order of the Appellate Division should be modified, with costs to the plaintiffs, insofar as it denied a *468 remedy prior to April 1, 1982 and the matter remitted to Special Term for the purpose of calculating the amount of salary due the plaintiffs from October 1, 1978, all in accordance with the writing herein, and, as so modified, affirmed.
Judges Jasen, Jones, Wachtler and Meyer concur with Judge Fuchsberg; Judge Gabrielli concurs in result only; Chief Judge Cooke taking no part.
Order modified, with costs to plaintiffs, and case remitted to Supreme Court, Westchester County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

. (US Const, 14th Amdt, § 1; NY Const, art I, § 11.)

. The plaintiffs’ complaint further alleged that monetary allowances in lieu of reimbursement for intercourt traveling expenses, a term of their employment prior to the date of court unification, should have been continued thereafter. However, Special Term having decided this issue adversely to the plaintiffs, they did not press it on appeal. We, therefore, have no occasion to pursue it here.

. Ironically, because of separate provisions for the President Judge of each court, the President Judge of the Suffolk District Court receives greater compensation than his *463 counterpart in Nassau County. Accordingly, as plaintiffs’ brief advises, he was not joined as a party to this litigation.

. The amici (Family Court, County Court and Surrogate Court Judges) claim they are similarly affected by this statute.

. The State, without statistical or other support, suggests that Nassau had to pay its District Court Judges higher salaries than did Suffolk because the former’s candidates were somewhat closer to the lure of private practice in New York City. But it is common knowledge that there has never been a paucity of candidates for the Bench of either county.